James Sandnes, Esq. (JS-8944)
BOUNDAS, SKARZYNSKI,
　WALSH & BLACK, LLC
One Battery Park Plaza, Floor 32
New York, New York 10004
Tel: (212) 820-7700
jsandnes@bswb.com



Attorneys for Defendant TriZetto Group, Inc.
　and Quality Care Solutions, Inc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Patrolmen's Benevolent Association of
the City of New York, Incorporated,
the Health and Welfare Fund of the
Patrolmen's Benevolent Association of
the City of New York, and the Retiree
Health and Welfare Fund of the
Patrolmen's Benevolent Association of
New York

　　　　　　　　　　　　Plaintiff,

　　　-against-

Quality Care Solutions, Inc.
　and the TriZetto Group, Inc.,

　　　　　　　　　　　　Defendants.

08-Civ-_____(　　　)

NOTICE OF REMOVAL OF
ACTION UNDER 28 U.S.C.
§ 1441(b)

**TRIAL BY JURY DEMANDED**

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

　　　　　PLEASE TAKE NOTICE that defendants TRIZETTO GROUP, INC. and

QUALITY CARE SOLUTIONS, INC.( collectively "TriZetto"), hereby remove to this Court

the state court action described below.

1.     On April 30, 2008, the action being removed was commenced in the Supreme Court of the State of New York, New York County, captioned *Patrolmen's Benevolent Association of the City of New York, Incorporated, the Health and Welfare Fund of the Patrolmen's Benevolent Association of the City of New York, and the Retiree Health and Welfare Fund of the Patrolmen's Benevolent Association of New York v. Quality Care Solutions, Inc. and the TriZetto Group, Inc.*, N.Y. County Index No. 601313/08.

2.     The first date on which defendant, TriZetto, received notice of the complaint was May 30, 2008, when TriZetto was served with the summons and complaint by substituted service.  True and correct copies of the summons and complaint are attached hereto as Exhibits A and B, respectively.

3.     This notice of removal is filed within 30 days after receipt by TriZetto, through service or otherwise, of a copy of the initial pleadings setting forth the claim for relief.

4.     This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1332, and is one which may be removed to this Court by defendant TriZetto pursuant to the provisions of 28 U.S.C. §1441(b) in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Neither TriZetto Group, Inc. nor Quality Care Solutions, Inc., ("Quality Care"),  are citizens of New York.

5.     TriZetto is informed and believes, and thereon alleges, that plaintiff Patrolmen's Benevolent Association of the City of New York, Inc., ("PBA"), was, at the time of the filing of this action, and still is, a not-for-profit corporation organized and existing under the laws of the State of New York, with its principle places of business in New York, New York.  (See Exhibit A at 1; Exhibit B ¶¶ 7)

6.     TriZetto is informed and believes, and thereon alleges, that plaintiffs Health and Welfare Fund of the Patrolmen's Benevolent Association of the City of New York, ("Active Fund") and Retiree Health and Welfare Fund of the Patrolmen's Benevolent Association of New York, ("Retiree Fund"), were, at the time of the filing of this action, and still are, welfare benefit trust funds, administered by the PBA, organized and existing under the laws of the State of New York, with their principle places of business in New York, New York.  (See Exhibit A at 1; Exhibit B ¶¶ 7)

7.     Pursuant to a U.S. Department of Labor Ruling, TriZetto is informed and believes, and thereon alleges, that plaintiffs Active Fund and Retiree Fund are "governmental plans" within the meaning of section 3(32) of ERISA.  The Active Fund and Retiree Fund were created pursuant to collective bargaining between the PBA and the City of New York, and continue to be subject to agreements between those entities.  Additionally, plan operations are subject to oversight by the City of New York through audit and reporting requirements and, in

the case of the Active Fund and Retiree Fund, certain basic procedures of plan administration must be approved by the City of New York.

8.      TriZetto is informed and believes, and thereon alleges, that both the Active Fund and Retiree Fund are administered pursuant to the laws of New York under a trust agreement by a board of trustees which, upon information and belief, is comprised of PBA President Patrick J. Lynch, PBA First Vice President John Puglissi, PBA Second Vice President Mubarak Abdul-Jabbar, PBA Treasurer Joseph Alejandro and PBA Recording Secretary Robert Zink ("Board of Trustees").  Because the Board of Trustees is made up of members of the Police Department, upon information and belief, by law, the Board of Trustees is comprised completely of citizens of New York and/or or New Jersey.

9.      Defendant TriZetto Group, Inc. was, at the time of the filing of this action, and still is, a public company organized and existing under the laws of the State of Delaware, with its principal place of business in Newport, California.

10.      Defendant Quality Care was, at the time of the filing of this action, and still is, a corporation organized and existing under the laws of the State of Nevada, with its principal place of business either in Newport, California, or in the alternative, Phoenix, Arizona.

11.      With respect to the jurisdictional amount, plaintiffs have alleged that they have been damaged "in an amount to be determined at trial."  (Exhibit B ¶ 63)  In this regard, the PBA alleges that it has already paid in excess of $783,000.00 to

defendant Quality Care Solutions, Inc.  (Exhibit B ¶ 60)

       12.    Assignment to Foley Square courthouse is appropriate because the case is being removed from the Supreme Court of the State of New York in and for the County of New York.

       TRIAL BY JURY IS DEMANDED.

       WHEREFORE, by reason of the foregoing, defendant TriZetto Group Inc. and  respectfully request that this action be removed to this Court for all purposes, including trial.

Dated:  New York, New York
       June 16, 2008

       BOUNDAS, SKARZYNSKI, WALSH & BLACK, LLC

       By:_____

          James Sandnes, Esq. (JS-8944)
       One Battery Park Plaza
       Floor 32
       New York, New York 10004
       Tel: (212) 820-7760
       jsandnes@bswb.com

       Attorneys for Defendant TriZetto Group, Inc.
        and Quality Care Solutions, Inc.

# EXHIBIT A

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK

-------------------------------------------------------------- x

PATROLMEN'S BENEVOLENT
ASSOCIATION OF THE CITY OF
NEW YORK, INCORPORATED, THE
HEALTH AND WELFARE FUND
OF THE PATROLMEN'S BENEVOLENT
ASSOCIATION OF THE CITY OF NEW
YORK, and THE RETIREE HEALTH
AND WELFARE FUND OF THE
PATROLMEN'S BENEVOLENT
ASSOCIATION OF NEW YORK

Plaintiff,

-against-

QUALITY CARE SOLUTIONS, INC.
and THE TRIZETTO GROUP, INC.,

Defendants.

-------------------------------------------------------------- x

Index No.: *601313/08*

Date Purchased: *April 30, 2008*

Date Filed: *April 30, 2008*

**SUMMONS**

NEW YORK
COUNTY CLERK'S OF
APR 3 0 2008
NOT COMPARED
WITH COPY FILE

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiffs designate New York County as the place of trial. The basis of venue is plaintiff's place of business located at 40 Fulton Street, New York, New York 10038.

{Client\001850\L908\00132477.DOC;1}

Dated:    New York, New York
          April 30, 2008

                                    TARTER KRINSKY & DROGIN LLP
                                    *Attorneys for Plaintiffs*

                                    By: _____
                                         Andrew N. Krinsky
                                         Rachel S. Fleishman
                                         1350 Broadway
                                         New York, New York 10018
                                         212-216-8000

                                    **Michael T. Murray, Esq.**

                                    By: _____

                                         General Counsel
                                         Patrolmen's Benevolent
                                         Association of the City of New
                                         York, Incorporated
                                         40 Fulton Street
                                         New York, New York 10038
                                         (212)298-9158


                                    *Co-Counsel for Plaintiff*


TO:    The TriZetto Group
       489 Fifth Avenue
       New York, New York 10017

       Quality Care Solutions, Inc.
       c/o The TriZetto Group
       489 Fifth Avenue
       New York, New York 10017

       Quality Care Solutions, Inc.
       14647 South 50th Street
       Building 1, Suite 150
       Phoenix, Arizona 85044

EXHIBIT B

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK

------------------------------------------------ x

PATROLMEN'S BENEVOLENT
ASSOCIATION OF THE CITY OF
NEW YORK, INCORPORATED, THE
HEALTH AND WELFARE FUND
OF THE PATROLMEN'S BENEVOLENT
ASSOCIATION OF THE CITY OF NEW
YORK, and THE RETIREE HEALTH
AND WELFARE FUND OF THE
PATROLMEN'S BENEVOLENT
ASSOCIATION OF NEW YORK

                Plaintiff,

   -against-

QUALITY CARE SOLUTIONS, INC.
and THE TRIZETTO GROUP, INC,

             Defendants.

------------------------------------------------ x

NEW YORK
COUNTY CLERK'S OFFICE

APR 3 0 2008

NOT COMPARED
WITH COPY FILE

Index. No.: 601318/08

**VERIFIED COMPLAINT**

       Plaintiffs, Patrolmen's Benevolent Association of the City of New York,

Incorporated ("the PBA"), The Health and Welfare Fund of the Patrolmen's Benevolent

Association of the City of New York (the "Active Fund"), and The Retiree Health and

Welfare Fund of the Patrolmen's Benevolent Association of the City of New York (the

"Retiree Fund")(collectively, "the Fund") (all references to "PBA" include "the Fund,"

unless expressly noted otherwise), by its attorneys, Tarter, Krinsky & Drogin LLP, for its

complaint against defendants alleges as follows:

## INTRODUCTION

     1.  The PBA serves the members of the New York City Police Department and

their families and dependents by, among other things, administering the dental benefits

program available to police officers and their families.  This action arises out of a

contract between the PBA and defendant, Quality Care Solutions, Inc. ("QCSI"), pursuant to which QCSI agreed to provide the PBA with a computer system for use in processing dental benefits claims.  Under the contract, the PBA was to receive an appropriate system, as well as training and on-going support services.  In addition, QCSI was obligated to update the software periodically and to provide those updates to the PBA on a timely basis.

2.   What QCSI provided was not at all what was promised.  The system provided was not a developed product, capable of performing in accordance with the requirements of the contract, but rather, a beta version of a nascent product, which was not ready to perform in the field.  The product that was marketed and licensed to the PBA did not yet exist, despite representations to the contrary by QCSI representatives.  Although QCSI later told the PBA that the product was in "beta" form, QCSI materially misrepresented the developmental status of the product, claiming that use of the beta product would subject the PBA to nothing worse than "the irritation of some small things not working until the final release is made."  In fact, what the PBA got was a product that was not installed and "live" until many months after the scheduled date of implementation -- causing the PBA to have to continue to use and support its old system, at additional cost -- and a product that has never been able to perform as required.  All told, the PBA has spent hundreds of man hours and hundreds of thousands of dollars dealing with the many shortcomings of QCSI's product and service.

3.   The technical problems with QCSI's system caused the PBA to fall months behind in the processing of claims, causing unhappiness and inconvenience to the men and women of the New York City Police Department, whom the PBA exists to serve, and

harming the reputation of the PBA and its leadership. The PBA's reputation and standing with many dental providers was also damaged as a result of the delay in payments and delays in processing pre-authorizations. Because of the delays, the PBA was forced to hire or deploy on overtime additional personnel to work through the backlog created by the many and varied technical shortcomings of QCSI's product and support service, further adding to the costs incurred by the PBA as a result of QCSI's failure to perform in accordance with the contract.

4.    The PBA has engaged in prolonged and intensive efforts to obtain satisfactory performance from QCSI, without success. Currently, rather than focusing on providing the PBA with a system that provides the contractually-required functionality and performance, QCSI has shifted its focus to arguing the PBA should abandon its present QCSI system, which QCSI is going to stop supporting soon, anyway, and purchase a new and separate QCSI system. The new system, according to QCSI, will not have the same problems as the old system.

5.    Thus, QCSI has never provided the PBA with a system that performs in accordance with the contract, but rather, has used the PBA as a test case on which to experiment with a product that, in the end, QCSI has decided not to continue making, selling or supporting. Adding insult to substantial economic injury, QCSI's suggested solution is for the PBA to buy its new product, a suggestion that is all the more outrageous given the fact that the PBA has effectively already funded the development of the new product and acted as the unwitting test case for the new product.

6.    The PBA seeks compensation for the damages incurred by the PBA as a result of QCSI's actions.

**PARTIES**

7.   Plaintiff, the PBA, is a not-for-profit corporation organized and existing pursuant to the laws of the State of New York with its principal place of business at 40 Fulton Street, New York, NY 10038.  The PBA administers certain welfare benefits through trusts, organized and validly existing pursuant to the laws of the State of New York:  plaintiff, The Health and Welfare Fund of the Patrolmen's Benevolent Association of the City of New York (the "Active Fund"), and plaintiff, The Retiree Health and Welfare Fund of the Patrolmen's Benevolent Association of the City of New York (the "Retiree Fund")(collectively, "the Fund").  (All references to "PBA" include "the Fund," unless expressly noted otherwise.)

8.   Upon information and belief, defendant, QCSI, is a corporation organized and existing pursuant to the laws of the State of Nevada with its principal place of business at 14647 South 50th Street, Building 1, Suite 150, Phoenix, Arizona 85044.  In or about 2006, QCSI became a wholly-owned subsidiary of The TriZetto Group ("TriZetto").

9.   Upon information and belief, TriZetto is a public company organized and existing under the laws of the State of Delaware.  TriZetto maintains an office at 489 Fifth Avenue, New York, New York 10017.  Upon information and belief, QCSI became a wholly-owned subsidiary of TriZetto through means of a merger with an entity created by TriZetto for that purpose.  In or about mid-April, 2008, TriZetto agreed to be acquired by Apax Partners, Inc. in a going-private transaction.  Upon information and belief, that transaction has not yet occurred.

10. Although QCSI is described on TriZetto's website as a "wholly owned subsidiary," in fact, TriZetto does not treat QCSI as a separate entity, but rather exercises

day-to-day control over QCSI's, at least with respect to its dealings with the PBA. Marguerite Brown, whose email signature describes her as an "Account Executive" of "TriZetto Group, Inc." has been one of the persons principally involved in dealing with the PBA. Ms. Brown's email signature does not reference QCSI at all. TriZetto executives and employees, like Ms. Brown and Robert Scavo, have personally controlled the decision whether to grant financial concessions to the PBA, the terms on which to grant any such concessions, and whether and on what terms the PBA would be offered an opportunity to purchase QCSI's new product. Because TriZetto has disregarded QCSI's corporate form, and has controlled the dealings between QCSI and the PBA, TriZetto is jointly and severally liable with QCSI.

## BACKGROUND

11. On or about May 2, 2002, the Fund entered into a Master Services Agreement with QCSI ("Master Services Agreement"). The Master Services Agreement, which is a QCSI form agreement, includes Exhibits A through F, all of which are also QCSI form agreements.

12. Also on or about May 2, 2002, the Fund and QCSI executed the related Software License Agreement (the Master Services Agreement and the Software License Agreement, together, "the Agreements").

13. The Master Services Agreement and the Software License Agreement are governed by the laws of the State of Delaware and the laws of the United States, without regard to the application of conflict of laws principles. The parties agreed in the Agreements that venue for disputes arising out of either would be State (or Federal) court in New York.

5

14. Under the Agreements, QCSI was to provide a dental claims processing system for a term of seven (7) years. The Master Services Agreement provides that the initial seven year term ". . . shall automatically be extended for consecutive additional terms of five (5) years each . . ., unless CLIENT provides QCSI with written notice of its intention not to extend the term at least one hundred twenty (120) days prior to the end of the Initial Term or any Subsequent Term." The Master Services Agreement also provides that it will terminate if the Software License Agreement is terminated.

15. The Software License Agreement may be terminated under a variety of circumstances, including if QCSI ". . . no longer commercially provides the Software to any clients" and provides the requisite notice of that fact to the PBA. However, in such a circumstance, QCSI must give the PBA ". . . the option to purchase for *a reasonable price* a copy of the source code to the Software for use pursuant to the Sole Use/Safeguard and Confidentiality requirements set forth herein." (Emphasis added.)

16. To date, neither party has terminated the Master Services Agreement or the Software License Agreement. QCSI has provided notice to the PBA that it will stop commercially supplying and supporting the system purchased by the PBA.

17. When the PBA entered into the Agreements in May 2002, it understood and agreed that it was purchasing the 4.10 aQDen system.

18. To induce the PBA to enter into the Agreements, QCSI represented to the PBA that the aQDen system was capable of handling dental benefit claims processing. QCSI provided the PBA with a list of clients whom it claimed used the system solely or principally for dental claims processing. Based on these representations, the PBA agreed to enter into the Agreements, in reliance on the fact that aQDen was capable of

processing dental benefit claims, and was actually being used to do exactly that by the customers identified to the PBA by QCSI.

19. In fact, as was only much later discovered by the PBA, aQDen had been used by QCSI customers for *medical* claims processing, which differs in important and material respects from *dental* claims processing. Upon information and belief, the PBA is the *only* customer of QCSI to attempt to use aQDen solely for the processing of dental benefit claims.

20. The PBA began to pay licensing fees under the Agreements to QCSI in July 2002, which it understood related to the 4.10 aQDen system that would be installed.

21. Various PBA personnel attended Whole Systems Training of 4.10 aQDen in Arizona and New York over a several-day period in July, 2002.

22. After receiving training on the 4.10 aQDen system, the PBA was informed by QCSI that, instead of using the 4.10 aQDen system, it should use the newer and improved 4.14 version of aQDen. Rolin O'Neal, the QCSI Project Manager, sent a July 17, 2002, email to the Information Technology coordinator of the PBA recommending the change, saying ". . . the 4.14 version of aQDen . . is still officially a beta product and still being tested, but *is scheduled to be finalized this summer.*" (Emphasis added.)

23. Thus, based on O'Neal's representation, the 4.14 version of aQDen was scheduled to be a final product before the scheduled "live" date for the Agreements, a point O'Neal emphasized in his email: "When the final, released version of 4.14 is ready, we will simply re-load it on your terminal servers. There will be minimal, if any, changes to the database. *This situation happens occasionally when a client's implementation date coincides with an impending release.*" (Emphasis added.) O'Neal

7

expressly characterized his email as a "*recommendation*" by QCSI for the PBA to use the 4.14 version. (Emphasis added.)

24. Unsurprisingly, the PBA relied on the recommendation of QCSI to use version 4.14 rather than version 4.10, which was repeated and amplified in later telephone conversations between representatives of QCSI and the PBA, including but not limited to Rolin O'Neal of QCSI and David Lepelstat of the PBA. The PBA's reliance on the recommendation was reasonable because the recommendation came from QCSI's Project Manager and was backed up by repeated and specific factual representations about the status of version 4.14 and the advantages to the PBA of accepting QCSI's recommendation.

25. Indeed, according to O'Neal's July 17, 2002 email, use of version 4.14 would cause the PBA to suffer nothing more nettlesome than ". . . living with the irritation of some small things not working until the final release is made."

26. Realistically, the PBA had little choice but to go along with the "recommendation" of QCSI to use version 4.14. QCSI exerted what amounted to economic coercion to force the PBA to accept 4.14 by waiting until the last minute to spring on the PBA the news that version 4.10 -- the version the PBA had agreed to buy and had been trained to use -- was not going to be supported any longer by QCSI, but was being immediately supplanted by a new version. QCSI further backed the PBA into a corner by emphasizing that, if the PBA opted to proceed with version 4.10, there would be additional costs and burden associated with changing to version 4.14 later down the line. In sum, the PBA had no realistic choice between staying with version 4.10 or accepting QCSI's "recommendation" to use version 4.14 instead.

8

27. On July 19, 2002, QCSI deployed version 4.14 aQDen prerelease (beta) to the PBA. QCSI did not provide a new training session in advance of deployment, notwithstanding that the training session that had been attended by the PBA's personnel had been a training session for version 4.10, not version 4.14.

28. Almost immediately, QCSI had to begin issuing Service Packs (*i.e.*, new code written to fix problems with the code already installed) to try to resolve issues with the software.

29. Each time a Service Pack was released, the PBA was required to test the equipment and software to ensure that existing functionality had not been damaged, existing software bugs were repaired and that the new functionality worked properly. These testing procedures can take at least a week to perform.

30. To date, QCSI has issued close to twenty Service Packs on the PBA's version 4.14, which underscores the fact that version 4.14 was far from being a developed product, in the very last days of beta status, that was likely to cause only "irritations" with respect to "small things."

31. After the issuance of six Service Packs, the PBA's system finally went "live" on April 7, 2003. (The original "live" date in the Agreements was November 2002.) By that time, the costs to the PBA from the delays and technical shortcomings had already begun to mount. Indeed, the PBA had already begun to communicate with QCSI about offsets to defray the substantial costs incurred by the PBA, including costs which resulted from the fact that QCSI's own personnel were not sufficiently familiar with their own software.

32. Under the Maintenance Services - Services Level Agreement, which is Exhibit D to the Master Services Agreement, the PBA was permitted a credit of a certain number of service hours, which was supposed to last a year. As set forth in a February 12, 2003 email from David Lepelstat, who was then the IT Director of the PBA, to Marguerite Brown of QCSI: "Of the 200 hours that were supposed to last us for the year . . . we were billed 164.6 hours in January ALONE." (Uppercase in original.)

33. The problems caused by the shortcomings of QCSI's system were many and varied, and included:

a.  A working Predetermination Module was not delivered on the go-live date.

b.  The COBRA-Rider was not activated properly.

c.  The module that was supposed to check the claim history of claims submitted for processing did not work properly, which resulted in the system generating incorrect claim authorizations, which in turn required hundreds of hours of overtime to manually clear the backlog. Service Pack 12 solved some of these problems, but it was not until Service Pack 15 that the issue was resolved to the satisfaction of the PBA.

d.  The system did not permit "downcoding," which is the ability to change the submitted code on a claim to a code that reflects that amount the PBA would actually cover. This functionality was working until QCSI released Service Pack 13, which created the problem.

e.  The Coordination of Benefits ("COB") module does not function. Compounding the problem, QCSI staff instructed the PBA to use the

10

wrong methodology. In February 2005, QCSI acknowledged that its COB module was inadequate, after having first been advised of the problem, in writing, on or about October 23, 2002. To this day, the Fund is still unable to use the flawed aQDen for COB, but rather, uses a manual process to work around the problems, which adds time, cost and burden.

f.   CDT (Current Dental Terminology). QCSI provided software to the PBA with the CDT codes pre-loaded. However, the pre-loaded codes were not the proper numerical codes then in use by the American Dental Association, but rather, were numerical codes that had been developed for a different client. The PBA therefore needed to have the ability to access the system to manually edit the codes. In the Master Services Agreement, QCSI represented that its performance under the contract would comport with all applicable statutes and regulations. The failure to provide the proper codes, and the subsequent delay in providing the PBA with the ability to update CDT codes, constitutes a breach of contract.

g.   Other problems existed, as detailed in the work orders submitted by the PBA to QCSI.

34. As a result of the ongoing and persistent problems, the PBA has spent, and will continue to spend, considerable sums of money to compensate for the shortcomings of the products and services provided by QCSI.

35. The PBA has tried to negotiate appropriate concessions from QCSI to compensate the PBA for its damages.

36. The PBA requires the use of a system for dental benefit claims processing. The only system it has at present is the inadequate 4.14 aQDen system, which has never functioned in a manner that complies with the requirements set forth in the Master Services Agreement. Now, the PBA faces the situation where QCSI is not even going to try to make the 4.14 aQDen perform up to the standards it should have been meeting years ago, but rather, has decided to move on to the next product.

37. The PBA has been damaged, and continues to be damaged, by the conduct of QCSI and TriZetto.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fraudulent Inducement Against QCSI)

38. The PBA repeats and realleges the allegations in paragraphs 1 through 36 hereof as if fully set forth herein.

39. The PBA entered into the Agreements in reliance on material representations made by QCSI regarding the capabilities of its system in order to induce the PBA to enter into the Agreements, including the representation that aQDen was being successfully used by other customers solely or principally for dental benefit claims processing, the representation that version 4.14 would be final within a matter of months, and the representation that "some small things" would be the only problems the PBA might encounter if it followed QCSI's recommendation to install version 4.14 instead of 4.10.

40. In addition to these misrepresentations, QCSI intentionally omitted to provide material facts, such as the true state of the development of 4.14 and the true manner in which QCSI customers were using aQDen.

12

41. The PBA was entitled to rely and did rely on QCSI's representations when it entered into the Agreements.

42. QCSI's representations that aQDen was being used by customers solely to process dental benefits claims, that 4.14 was nearly finalized, and that the PBA would have only "the irritation of small things" if it followed QCSI's recommendation to use version 4.14 instead of version 4.10 were false and fraudulent when made.

43. As a direct and proximate result of QCSI's fraudulent representations and omissions, the PBA has been damaged in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract Against All Defendants)

44. The PBA repeats and realleges the allegations in paragraphs 1 through 42 hereof as if fully set forth herein.

45. QCSI has failed to perform as required by the Agreements.

46. QCSI has failed to provide a system that is capable of meeting the performance requirements set forth in the Agreements.

47. In addition, QCSI has failed to provide the service support required under the Agreements when notified by the PBA of the specific problems it experienced with the 4.14 system.

48. As a direct and proximate result of QCSI's breach of the Agreements, PBA has been damaged in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing Against All Defendants)

49. The PBA repeats and realleges the allegations in paragraph 1 through 47 hereof as if fully set forth herein.

50. The Agreements include covenants of good faith and fair dealing implied by law and defendants are bound by those implied covenants.

51. QCSI and TriZetto have each breached and continue to breach their duty of good faith and fair dealing by using the PBA as a guinea pig to develop version 4.14 of aQDen from a beta product to a final product, for its own benefit and without the knowledge or agreement of the PBA. By acting in this manner, QCSI deprived the PBA of the intended benefit of the Agreements. In addition, QCSI's conduct effectively turned the PBA into an unwitting provider of equity financing for the development of version 4.14 of aQDen, while denying the PBA any of the benefits of its unwitting investment.

52. As a direct and proximate result of defendants' breaches of the covenant of good faith and fair dealing implied in the Agreements, the PBA has been damaged in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### (Unjust Enrichment)

53. The PBA repeats and realleges the allegations in paragraph 1 through 51 hereof as if fully set forth herein.

54. Defendants have been unjustly enriched at the expense of the PBA because they caused PBA to effectively underwrite several years' worth of development work on version 4.14. The fact that nearly twenty Service Packs have been issued to the PBA underscores the extent of development work that QCSI has performed on the PBA's nickel.

55. The PBA did not agree to defray the costs of development of version 4.14. Rather, the PBA agreed to follow QCSI's recommendation to accept version 4.14 only based on the repeated and specific factual representations of QCSI that version 4.14 would be a final product prior to the scheduled "live" date for the PBA's system.

56. As a direct and proximate result of defendants' unjust enrichment, the PBA has been damaged in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Equitable Relief)

57. The PBA repeats and realleges the allegations in paragraph 1 through 55 hereof as if fully set forth herein.

58. The PBA still does not have a system that performs in accordance with the Agreements, yet the PBA needs such a system.

59. The PBA has already paid in excess of $783,000.00 to QCSI.

60. In addition to the money paid directly to QCSI, the PBA has incurred considerable additional sums in costs far in excess of the jurisdictional threshold of this Court as a result of QCSI's conduct.

61. Under the Software License Agreement, if QCSI "no longer commercially provides the Software to any clients" and provides the requisite notice of that fact to the PBA, QCSI must give the PBA "the option to purchase for *a reasonable price* a copy of the source code to the Software for use pursuant to the Sole Use/Safeguard and Confidentiality requirements set forth herein." (Emphasis added.)

62. The PBA is entitled to an order directing QCSI to provide the source code of the Software for version 4.14 of aQDen to the PBA without further cost, because, under the circumstances, the amount in excess of $165,000.00 that has already been paid

to QCSI for its inadequate performance should be deemed to have included "a reasonable price" for the source code.

63. In the alternative, the PBA is entitled to an order directing QCSI to provide the PBA with a copy of the new product QCSI is releasing, which QCSI claims will provide the functionality that version 4.14 of aQDen could not provide, without charge or for a nominal sum. QCSI developed and funded its new product by using the PBA as an unwilling test case. Accordingly, the PBA is entitled to a copy of the product because it has already, in effect, paid for the product.

**WHEREFORE**, plaintiffs demands judgment against defendants for:

(a)     compensatory damages in an amount to be determined at trial;

(b)     equitable relief, including, but not limited to, an order compelling QCSI to provide the source code for version 4.14 of aQDen or the current version of their most-recently developed product which would provide the functionality promised;

(c)     interest;

(d)     costs, disbursements and attorneys' fees; and

(e)     such other relief as the court deems just and proper.

Dated: April 30, 2008
      New York, New York

TARTER KRINSKY & DROGIN LLP

By: _____
      Andrew N. Krinsky
      Rachel S. Fleishman
      1350 Broadway
      New York, New York 10018
      (212) 216-8009

**Michael T. Murray, Esq.**

By: _____

      General Counsel
      Patrolmen's Benevolent Association of the
      City of New York, Incorporated
      40 Fulton Street
      New York, New York 10038
      (212)298-9158

      *Co-Counsel for Plaintiff*

Doc id 132331

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

Geraldine Hennessy, being duly sworn, deposes and says:

I am the General Manager of the Funds, plaintiffs in the within action. I have read the foregoing Verified Complaint and know the contents thereof, the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. The grounds of my belief as to all matters stated upon information and belief are: books, records, correspondence and other documents in the file.

_____
Geraldine Hennessy

Sworn to before me this
30 day of April, 2008.

_____
Notary Public

DAVID M. NICHOLSON
NOTARY PUBLIC
STATE OF NEW YORK
REGISTRATION NO. 02NI6108981
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES APRIL 26, 20__

18